UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
LAW OFFICES OF CURTIS V. TRINKO, LLP, : 00 Civ. 1910 (SHS)
Individually and on Behalf of All Others Similarly :
Situated, : OPINION & ORDER
  :
                       Plaintiff, :
  :
        -against- :
  :
VERIZON COMMUNICATIONS INC., :
  :
                      Defendant. :
-------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

**I.     Introduction**

In the classic Guy de Maupassant tale The Necklace, a once-proud social climber toils and travails for ten years to replace a diamond necklace she had borrowed and lost. Only years later, with her life ruined, does the protagonist learn that the diamonds were fakes. Similarly here, after six years of contentious and costly litigation, it has come to light that plaintiff's claims have been based on a false premise and need be dismissed.

From the beginning, plaintiff – the law offices of Curtis V. Trinko, LLP – set forth the following story: as a new customer of AT&T, which had recently started to compete with Verizon[1] for local phone customers as a result of the Telecommunications Act of 1996, Trinko received inferior phone service because Verizon was not affording AT&T equal access to the "local loop" of Verizon-controlled telephone wires. Trinko first made this allegation in its

---

[1] On June 30, 2000, Bell Atlantic Corp. merged with GTE Corp. and the combined company did business as Verizon Communications Inc.; as used herein, "Verizon" refers to the post-GTE merger Verizon Communications Inc. and the pre-GTE merger Bell Atlantic Corp.

1

original complaint, filed in 2000, and has stuck with this basic narrative through two dismissals by this Court and subsequent appeals to the United States Court of Appeals for the Second Circuit and the U.S. Supreme Court. Trinko's theory is that by discriminating against customers of AT&T, Verizon violated the Federal Communications Act and tortiously interfered with those customers' contracts with AT&T.

Now that the relevant discovery has been completed, however, it is clear that the allegedly "discriminatory" service problems Trinko complained of lasted for only four months, ending in February 1999. This might be enough to survive dismissal, but for one crucial wrinkle: plaintiff did not become a customer of AT&T until five months afterwards, in July of that year. Thus, there is no evidence that Trinko ever suffered as a result of Verizon's purported discriminatory conduct, which is the only basis for Trinko's claims. For this reason, defendant's motion for summary judgment is granted.

**II.     Background**

According to Trinko, the genesis of this action dates back to 1982, when American Telephone and Telegraph ("AT&T") lost its decades-long domination of the telecommunications market by entering into a consent decree with the United States Department of Justice requiring it to split from its local subsidiaries, known as "Baby Bells," through which it had provided local telephone service. (Second Amended Complaint ("SAC") ¶¶ 4-5.) Although the decree encouraged competition in the long distance telephone service and equipment markets, it failed to make similar competitive reforms in the markets for local telephone services, which the Baby Bells controlled. (Id. ¶¶ 5-6.)

Congress attempted to plug this regulatory loophole by passing the Telecommunications Act of 1996 (the "1996 Act"), Pub. L. No. 104-104, 110 Stat. 56, which amended the Federal

Communications Act of 1934, 47 U.S.C. § 151 et seq., and endeavored to divest the Baby Bells of monopoly control over local telephone services in their respective markets.  See Verizon Commc'ns Inc. v. FCC, 535 U.S. 467, 488, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002); SAC ¶ 8.  The 1996 Act dubbed the Baby Bells incumbent "Local Exchange Carriers" ("LECs") and required them to undertake certain efforts to allow newcomers, styled as "competitive" LECs, to enter the marketplace as providers of local telephone services.  See 47 U.S.C. § 251(c); Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004).

One of the Act's provisions enables competitive LECs to use elements of an incumbent's local network on an "unbundled" basis.  47 U.S.C. § 251(c)(3); see Trinko, 540 U.S. at 402.  The competitors can combine these unbundled network elements with elements from their own networks to provide local telephone service to the public.  47 U.S.C. § 251(c)(3); see Trinko, 540 U.S. at 402.  One of the elements that incumbents must unbundle and provide nondiscriminatory access to is the "local loop" – i.e., the copper telephone wire leading from a residence to a switching center that allows customers to make and receive local calls.  See 47 C.F.R. § 51.319; Decl. of Beth A. Abesamis dated Nov. 4, 2005 ("Abesamis Decl.") ¶ 6.

Following the passage of the 1996 Act, Verizon was the incumbent LEC serving New York City, where Trinko was located.  (SAC ¶ 17.)  On March 9, 2000, Verizon entered into a consent decree with the Federal Communications Commission pursuant to which the company paid a $3 million fine to end an investigation into its alleged failure to provide adequate access to local phone service competitors in New York as required by the 1996 Act.  See Press Release, http://www.fcc.gov/eb/News_Releases/bellatl.html (last visited Aug. 14, 2006); Law Offices of

Curtis V. Trinko, LLP v. Bell Atlantic Corp., 123 F. Supp. 2d 738, 740 (S.D.N.Y. 2000).  Trinko filed its initial complaint in this action the next day.

That first complaint was brought on behalf of Trinko and a class of "all those who were customers of a company other than [Verizon] with respect to the provision of Local Phone Service in the Geographic Market at any time since February 6, 1996 and who were damaged by the conduct complained of herein."  (Compl. ¶ 35.)  Trinko alleged that customers of competitive LECs had been harmed because Verizon provided them with "a level of service that is materially below the level that is accorded customers of [Verizon] in functionally identical circumstances."  (Compl. ¶12.)  The complaint asserted that such "discrimination" and "anticompetitive" use of Verizon's "monopoly power" over the local loop it controlled amounted to violations of sections 251 and 202(a) of the Communications Act of 1934 and section 2 of the Sherman Antitrust Act, as well as tortious interference with the prospective class members' contracts with Verizon's rivals.  (Compl. ¶¶ 43-77.)

The Court dismissed that complaint for (1) failure to state a claim pursuant to the Sherman Act because Verizon's alleged conduct was not "anticompetitive" within the meaning of the antitrust laws; and (2) lack of prudential standing as to the Communications Act claims because that law prohibits only discrimination against a carrier's own customers and does not cover damages based on the rights of a third party such as a competitive LEC.  See Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp., 123 F. Supp. 2d 738 (S.D.N.Y. 2000).  The Court also denied Trinko's subsequent motion for reconsideration.  See Law Offices of Curtis V. Trinko LLP v. Bell Atlantic Corp., No. 00 Civ. 1910, Order (S.D.N.Y. Jan. 9, 2001).

Trinko then filed its First Amended Complaint ("FAC"), which in most respects was identical to the first but also specified that Trinko was a customer of AT&T and had "suffered injury to its business" as a result of Verizon's alleged discriminatory conduct. (FAC ¶ 23.)

The Court dismissed the FAC for essentially the same reasons that it dismissed the original complaint. See Law Offices of Curtis V. Trinko LLP v. Bell Atlantic Corp., No. 00 Civ. 1910, Order (S.D.N.Y. Apr. 26, 2001).

Trinko appealed that decision to the U.S. Court of Appeals for the Second Circuit, which affirmed the dismissal of Trinko's claim pursuant to section 251 of the Communications Act but reinstated its claims pursuant to section 202(a) of the Communications Act, which prohibits "unreasonable discrimination" in the provision of telephone services, and section 2 of the Sherman Act. Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp., 305 F.3d 89 (2d Cir. 2002); 47 U.S.C. § 202(a). With regard to the Communications Act, the Second Circuit reasoned that the doctrine of prudential standing did not bar Trinko's section 202(a) claim because Trinko's right to sue stemmed from sections 206 and 207 of the Act, which make parties who violate other of its provisions, including section 202(a), liable to parties they injure through such violations. Id. at 99. Because Trinko alleged that (1) Verizon violated section 202(a) by discriminating against AT&T's customers and (2) Trinko was directly injured by this conduct "because it received poor local phone service," Trinko had properly stated a claim pursuant to the Communications Act. Id. at 99-100. With regard to the Sherman Act, the court held that Trinko had stated a claim because it properly alleged that Verizon used its monopoly power to restrict AT&T's access to the "local loop," which, according to Trinko, was essential to competing in the local phone service market. Id. at 107-08.

Verizon petitioned the Supreme Court for a writ of certiorari to review the Second Circuit's decisions reinstating Trinko's claims pursuant to the Sherman Act and section 202(a) of the Communications Act.  In March 2003, the Supreme Court granted the petition solely to review the Second Circuit's antitrust ruling.  Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 538 U.S. 905, 123 S. Ct. 1480, 155 L. Ed. 2d 224 (2003).  After briefing and argument, the Court held that the conduct alleged by Trinko – namely, that Verizon had not provided adequate assistance to its rivals as required by the 1996 Act – did not violate the Sherman Act.  Verizon v. Trinko, 540 U.S. at 405-16.  After the issuance of the Supreme Court's mandate, the Second Circuit vacated its prior judgment reversing this Court's dismissal of Trinko's antitrust claims and remanded the action "for such remaining proceedings as are appropriate to the disposition of all other aspects of this case."  Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp., No. 01 Civ. 7746, Order (2d Cir. Apr. 15, 2004).

Following that order, on October 8, 2004 – more than four and a half years after this action began – Trinko filed its second amended complaint, this time asserting only two claims. The first, brought pursuant to section 202(a) of the Communications Act, alleges that Verizon discriminated against "those users of its physical wires who are customers of local phone service companies other than Verizon."  (SAC ¶ 1.)  The second is a state law claim alleging that Verizon tortiously interfered "with the contracts that customers of its local phone service competitors have with those competitors."  (Id.)

Both claims are based on the same alleged conduct: that "throughout the class period" beginning on March 10, 1996, Verizon did not afford competitive LECs "access to the local loop on a par with its own access."  (Id. ¶¶ 21, 26.)  In so doing, "Verizon has fulfilled orders of other local phone service providers' customers after fulfilling those for its own local phone service;

6

has failed to fill a substantial number of orders for other local phone service providers' customers substantially identical in circumstances to its own local phone service customers for whom it has filled orders; and has systematically failed to inform other local phone service providers of the status of their orders with Verizon concerning their … customers."  (Id.)  Trinko was a victim of this alleged conduct because it had "obtained local phone service in the Geographic Market from AT&T … and has suffered injury to its business as a result of the conduct of Verizon complained of herein."  (SAC ¶ 22.)

Verizon again moved to dismiss.  The Court denied that motion in light of the Second Circuit's decision reinstating Trinko's claim pursuant to section 202(a).  Law Offices of Curtis V. Trinko, LLP v. Verizon Commc'ns Inc., No. 00 Civ. 1910, Order (S.D.N.Y. Aug. 4, 2005).

After discovery proceedings, Verizon has now moved for summary judgment in its favor.  Verizon asserts that "documentary evidence – confirmed by AT&T's sworn statement – demonstrates conclusively that Trinko was a customer of [Verizon], not AT&T" during the period of alleged service problems.  (Def.'s Mem. in Support of Motion for Summary Judgment at 1.)  Thus, "there is no evidence to support the allegation that Verizon provided AT&T inferior access that in turn caused Trinko harm."  (Id.)  Trinko contends that summary judgment is inappropriate because discovery has not yet been completed and "whether Verizon or AT&T was the provider of local telephone service" during the time period of alleged harm is a disputed issue of material fact.  (Pl.'s Mem. in Opp. to Def.'s Motion for Summary Judgment at 2.)

**III.   Discussion**

A. Summary Judgment Standard

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995); LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995).  In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see also LaFond, 50 F.3d at 171.  However, the party opposing summary judgment – here, Trinko – "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of its factual assertions.  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); see Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996); Stroud v. New York City, 374 F. Supp. 2d 341, 349 (S.D.N.Y. 2005).  Trinko must show that "there is sufficient evidence favoring [it] for a jury to return a verdict" in its favor.  Golden Pacific Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)) (internal quotation marks omitted).

B. Trinko's Remaining Claims

At issue are Trinko's two remaining claims set forth in the SAC: a violation of section 202(a) of the Communications Act and tortious interference with Trinko's contract with AT&T.

Section 202(a) of the Communications Act provides:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a).  To prove a claim of discrimination "in connection with like communication service" pursuant to this section, Trinko must establish three elements: (1) that Verizon provided "like" communications services; (2) that the services were provided to Trinko under less favorable terms or conditions than they were to Verizon's own customers; and (3) that any such difference in service was unreasonable.  See Trinko, 305 F.3d at 98-99; Nat'l Commc'ns Ass'n, Inc. v. AT&T Corp., 238 F.3d 124, 127 (2d Cir. 2001).  In addition, because Trinko's claim for relief "originates from sections 206 and 207" of the Communications Act, Trinko, 305 F.3d at 99, Trinko must "prove specific damages flowing from violations of the Act."  Convoy v. AT&T Corp., 241 F.3d 242, 250-51 (2d Cir. 2001).

To prove a claim of tortious interference with contract pursuant to New York law, Trinko must prove "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff."  Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (N.Y. 1993).

Each of plaintiff's claims relies on the same core factual allegation: that Trinko was a customer of AT&T and suffered damages because Verizon gave its competitors inferior access to the local loop of telephone wires that it controlled.  If the evidence fails to support this allegation – and instead, as Verizon argues, demonstrates conclusively that Trinko was not harmed by Verizon while a customer of AT&T – both of Trinko's claims must fail.

C. The Factual Record

Curtis Trinko testified on behalf of the law offices that bear his name as plaintiff's designated witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. (Deposition of Curtis V. Trinko dated Oct. 6, 2005 ("Trinko Dep."), Ex. 1 to Decl. of Jennifer R.

Rackoff ("Rackoff Decl.") and Ex. F to Aff. of Peter S. Linden dated Jan. 4, 2006 ("Linden Aff."), at 6:16-19; 7:15-8:25.)  Mr. Trinko testified that his law firm, which consisted of four attorneys and three or four support staff, received its local telephone service from Verizon through October 1998, when the firm's tenancy at 310 Madison Avenue in New York City ended.  (Id. at 19:16-26:2.)  Mr. Trinko testified that he intended to switch to AT&T upon the move to new offices in an attempt to "cut [his] costs."  (Id. at 26:11-16.)  He said that he signed a service proposal from AT&T in advance of the move and that AT&T installed the firm's new telephones.  (Id. at 27:11-29:11.)

On October 27, 1998, the Trinko partnership moved its offices to 16 West 46th Street. (Id. at 29:2-8.)  Throughout his deposition, Mr. Trinko repeatedly insisted – despite being shown several documents suggesting otherwise – that beginning on that first day in the West 46th Street offices, AT&T provided his firm with its local telephone service.  (Id. at 28:5-17; 50:2-14; 56:17-57:3; 100:24-101:4.)  He testified that when the telephones did not work for the first two or three days after the move, he had a staff member of the firm call AT&T "to find out what the problem was."  (Id. at 31:3-32:16.)  He said that service representatives of AT&T came to investigate and determined that the wiring AT&T had run from the "hub in the basement . . . up to our offices on the 7th floor" was "in working order," but that the wiring "from the hub on" were the property of Bell Atlantic[2] and that the problem "must be in Bell Atlantic's wiring."  (Id. at 35:13-36:21; 47:13-17.)  He said that representatives from AT&T told him that they "put in a service ticket" with Bell Atlantic and that the telephones began working "two or three days later."  (Id. at 47:18-48:3.)

---

[2] As noted above, Bell Atlantic is the corporate predecessor to Verizon.

Mr. Trinko testified that telephone service at his firm's offices "was an endemic problem over the next three or four months, that the phone service would be on for a while, go off for a day. On for a while, down for a couple of hours." (Id. at 48:2-6.) He said that there were "audibility problems," "clicking" and "static" and that on between five and eight occasions, service went down for a day or more. (Id. at 48:7-11; 95:17-96:4; 53:13-22; 97:11-16.) When these problems occurred, the firm would contact "the representatives of AT&T," who came to the offices "on numerous occasions" to fix the outages. (Id. at 95:24-96:18.) Mr. Trinko said that he was told that "most of the times it was Bell Atlantic" that was responsible for the problems. (Id. at 52:16-53:3.)

After the first "three or four months" in the new offices, Mr. Trinko said that "the severe problems ended." (Id. at 48:12-18.) At that point – sometime in February 1999 – the telephone service "got better," although a "few" "intermittent" problems continued throughout the first year in the new offices. (Id. at 54:15-21.) However, after those first three or four months, the firm experienced no more than "one or two" "short" outages that lasted "not for days, but for hours," according to Mr. Trinko. (Id. at 97:17-23.)

Plaintiff points to only a single piece of documentary evidence supporting this account of events: an AT&T "PrimePath Tariffed Service Order Form" signed by Mr. Trinko on October 8, 1998. (Ex. C to Linden Aff.) The order form shows a "Desired Due Date" of October 28, 1998 for the opening of an AT&T account. (Id.) However, that document is not countersigned by AT&T (the space for AT&T's signature is blank), one of its pages contains a blank grid with no information about the services Trinko intended to order and there is no indication whether, when, or if the document was ever received by AT&T. (Id.)

Defendant, on the other hand, has presented volumes of contemporaneous documentary evidence – the existence and validity of which Trinko does not dispute – that establish beyond peradventure that it was Bell Atlantic and not AT&T that provided plaintiff with telephone service during the period of allegedly "severe" service problems and that Trinko did not in fact become a customer of AT&T until July 1999.

First, Verizon's records show that in October 1998, Trinko placed service orders with Bell Atlantic to transfer its numbers from 310 Madison Avenue to 16 W. 46th and that the numbers were in fact transferred on October 27, 1998, the date of the firm's relocation. (Reply Decl. of Beth A. Abesamis dated Jan. 17, 2005 ("Abesamis Reply Decl.") ¶¶ 7-8.)

Second, AT&T has no records of Trinko making any service complaints immediately following the move to the new offices, when the telephones that Mr. Trinko said were installed by AT&T did not work. (Decl. of Alencia Deanda-Gregg dated Nov. 1, 2005 ("AT&T Decl.") ¶¶ 4-7.) Verizon's records, on the other hand, show that Trinko put in service complaints to Bell Atlantic – its predecessor – on October 28 and 29, 1998 – the two days following the move – and that the problems were resolved on October 29, 1998. (Abesamis Decl. ¶¶ 9-10.)

Third, Mr. Trinko wrote a letter to Bell Atlantic on November 13, 1998 complaining about the lack of service during the first two days in the new offices and specifying that "[a]ppropriate arrangements were made with Bell Atlantic well in advance of the move." (Letter from Curtis V. Trinko to Bell Atlantic Legal Department dated Nov. 13, 1998, Ex. 2 to Rackoff Decl.) The letter added that Bell Atlantic employees had "represented that our phone system would be operational in our new 46th Street offices by Wednesday morning (October 28) as we had requested" and that the firm had made "repeated telephone calls to Bell Atlantic service representatives to restore service." (Id.)

Fourth, Trinko was billed for service by Bell Atlantic through July 1999 and the firm set up a payment plan with Bell Atlantic in September 1999 that did not contest any of the prior bills. (Exs. 3, 4 and 5 to Rackoff Decl.) Indeed, when AT&T attempted to bill Trinko for services prior to August 1, 1999, Trinko complained and pointed out that "the actual connection date [for service from AT&T was] August 13, 1999" and that AT&T had agreed that it "would absorb the charges occurred for service performed on July 24, 1999 in regards to the switching of lines from Bell Atlantic to AT&T." (Letter from Justine M. Larsen, Bookkeeper, to AT&T dated Aug. 19, 1999, Ex. 9 to Rackoff Decl.)

Fifth, AT&T wrote to Trinko on November 23, 1998 – four weeks after the move – to acknowledge its initial receipt of Trinko's order to obtain local telephone service. (Letter from AT&T Project Management Team to Law Offices of Curtis V. Trinko dated Nov. 23, 1998, Ex. 6 to Rackoff Decl.) The letter states that the "concurred due date" for Trinko's service would be determined "[w]ithin the next couple of days." (Id.)

Sixth, an AT&T manager acting "on behalf of AT&T" submitted a sworn declaration stating that "AT&T's records show that Trinko ordered local service from AT&T in November 1998, and reflected a targeted turn-up date for that service of March 15, 1999. AT&T's records also show that Trinko's numbers were not ported until July 1999." (AT&T Decl. ¶¶ 2, 4.) The declaration notes that "AT&T has conducted a good-faith, diligent search of its records and has located no record that it requested that Trinko's numbers be ported prior to July 1999." (Id.) A July 28, 1999 facsimile from AT&T to Trinko confirms this sequence, informing Trinko that "As of 7/28/99, AT&T has ported (in other words = switched to AT&T) two of [Trinko's phone lines]" and that on August 12, 1999, a third line was scheduled to be ported. (Fax dated Jul. 28, 1999, Ex. 8 to Rackoff Decl.) Verizon's records also support this timeline; they show that

13

Verizon received electronic orders from AT&T on July 9 and July 29, 1999 to port Trinko's telephone numbers to AT&T and that Verizon subsequently ported those numbers. (Abesamis Decl. ¶¶ 9-10, 14.)

D. Analysis

The foregoing recitation of facts shows that the only evidence supporting Trinko's claim that it was harmed by Verizon's failure to give AT&T equal access to the "local loop" comes from the deposition testimony of Curtis Trinko and an incomplete order for service that was not countersigned by AT&T and does not bear any indication that it was ever received by AT&T as signed by one side. Defendant, on the other hand, has supplied conclusive documentary evidence showing that during the period of alleged harm – from October 27, 1998 through approximately February 1999 – Trinko was a customer of Verizon, not AT&T.

It is true that in evaluating a motion for summary judgment, the "general rule" is that district courts "may not weigh evidence or assess the credibility of witnesses." Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005). However, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" Id. at 554 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" Id. (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

Here, even after drawing all inferences in the light most favorable to Trinko, a juror could not reasonably believe that AT&T provided Trinko with telephone service during the period of alleged service problems in light of the overwhelming and uncontroverted documentary evidence

showing otherwise. Mr. Trinko's testimony that his firm contracted with AT&T to provide service upon the relocation, that his staff contacted AT&T when service problems arose and that AT&T representatives complained about problems in "Bell Atlantic's wiring" is simply not credible in the face of the substantial documentary evidence otherwise.

Thus, there is insufficient evidence for a reasonable juror to conclude that Trinko was harmed by Verizon's alleged discrimination against AT&T or that Verizon tortiously interfered with Trinko's contract with AT&T. Given these circumstances, in which "'no reasonable person would undertake the suspension of disbelief necessary to give credit to [plaintiff's] allegations,'" summary judgment is appropriate. Jeffreys, 426 F.3d at 555 (quoting Schmidt v. Tremmel, No. 93 Civ. 8588, 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995)) (upholding grant of summary judgment in defendants' favor because plaintiff's testimony, which constituted the only evidence supporting his claim, was replete with such "obvious inconsistencies" as to render it incredulous); see also Applied Cos. v. United States, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (plaintiff's affidavit did not create a genuine issue of material fact "[i]n light of the strong documentary evidence" contradicting it); Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) ("when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations and dismiss the claim.").[3]

---

[3] In a last ditch effort to salvage its case, on May 2, 2006 – more than four months after defendant's motion for summary judgment was fully briefed – plaintiff submitted the supplemental declaration of Neil Cox, a purported telecommunications expert, in order to present a completely new theory of liability: that in early 1999, Verizon took longer than it should have to set up a "special access line" for AT&T to service Trinko. (See Supplemental Decl. of Neil Cox dated May 2, 2006 ¶¶ 4-10, Ex. 1 to Supplemental Aff. of Peter S. Linden dated May 2, 2006 ("Supp. Linden Aff.").)

This eleventh-hour change in course fails for two reasons. First, it is untimely. At a conference on April 7, 2006, the Court granted plaintiff permission to file supplemental papers solely to address certain Verizon documents that were not produced until the submission of Verizon's reply brief on January 18, 2006. (See Supp. Linden Aff. ¶

Trinko also contends that summary judgment is inappropriate because discovery has not been completed. However, Trinko has not identified any yet-to-be-discovered facts that could reasonably be expected to create a genuine issue of material fact sufficient to defeat Verizon's motion. See Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (quoting Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) ("'A party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'"). The only relevant documents identified by Trinko as missing from defendant's production – service orders showing Trinko's request to remain a Verizon customer upon the move to the new offices – were turned over by defendant when it filed its reply papers in connection with this motion.[4] (Abesamis Reply Decl. ¶ 7.) Those service orders confirmed what the rest of the documentary evidence already made obvious: that Trinko chose Verizon, not AT&T, to supply its local phone service when it moved to new offices in October 1998.

---

2; Letter to the Court from Henry B. Gutman dated May 15, 2006.) The Cox declaration, on the other hand, is devoted exclusively to documents that were produced to plaintiff on or before October 7, 2005, three months before plaintiff filed its original opposition to summary judgment, and therefore need have been addressed, if at all, in plaintiff's opposition papers.

      Second, even if the Cox declaration were timely, it would be insufficient to create a genuine issue of material fact because the setting up of a special access line for telephone service is wholly distinct from granting nondiscriminatory access to Verizon's existing "local loop," which is the only basis for plaintiff's Communications Act claim. Moreover, nothing in the Cox declaration supports the allegation that Trinko was harmed by any alleged delay by Verizon in setting up a special access line. In fact, the only evidence before the Court in this regard is AT&T's declaration attesting that it did not request that Trinko's numbers be ported until July 1999 and that Verizon complied with these requests that same month. (AT&T Decl. ¶¶ 2, 4.) Thus, the belated Cox declaration does not rectify Trinko's failure to provide sufficient evidence to support its contention that Verizon's discrimination against customers of AT&T caused it harm.

[4] Given the lateness of production, the Court gave Trinko a full opportunity to respond to these documents before deciding this motion.

## IV. Conclusion

Because Trinko has provided no credible evidence that it was harmed by any discriminatory actions by Verizon or that Verizon tortiously interfered with its contract with AT&T, and because Trinko has not identified any unproduced discovery that could rescue its claims, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment dismissing the second amended complaint.

Dated: New York, New York
September 27, 2006

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.